IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

David Judd,                              :
                     Plaintiff           :      Civil Action 2:12-cv-00050

        v.                               :      Judge Smith

Michael J. Astrue,                       :      Magistrate Judge Abel
Commissioner of Social Security,
                     Defendant           :

**REPORT AND RECOMMENDATION**

Plaintiff David Judd brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for

review of a final decision of the Commissioner of Social Security finding that he was

disabled beginning March 9, 2008, but not before.  This matter is before the  Magistrate

Judge for a report and recommendation on the parties' cross-motions for summary

judgment.

**Summary of Issues.** On November 22, 2004, plaintiff David Judd filed his fourth

claim for supplemental security income benefits, alleging he became disabled in

January 1994, at age 40. However, he last worked in 1988, some six years before the

alleged onset date. (R. 376.) On March 28, 2008, the administrative law judge issued a

decision finding that Judd was disabled as of March 9, 2008, but not before. Specifically,

the administrative law judge found that between November 2004 and March 2008 Judd

retained the ability to perform a reduced range of work having light exertional

demands. In March 2008, Judd had his fifty-fifth birthday. Since he could not perform a

full range of light work, 20 CFR 416.966 directed a finding of disability as of March 9,

2008. (R. 31.)

Plaintiff filed a civil action in this Court. On September 2, 2010, this Court

remanded the case because the administrative law judge failed to provide good reason

or described the weight he accorded plaintiff's treating physician, Dr. Murray.  *See* case

no. 2:09-cv-00283. In case number 2:09-cv-00283, the Commissioner argued that the

administrative law judge was not required to give good reasons for rejecting Dr.

Murray's opinions because they were outdated and did not concern the relevant time

period. The Magistrate Judge, however, rejected this argument, stating:

> As his opinion reflects, the ALJ considered Plaintiff's disability status only
> after November 22, 2004, as he concluded that previous determinations
> were final and binding. (R. at 19.) Nevertheless, in making his
> determination regarding Plaintiff's severe impairments, the ALJ relied
> heavily on Plaintiff's medical history before November 22, 2004, including
> medical records from 1998. Accordingly, it is clear that the ALJ *did*
> consider this period relevant to his disability determination.4 *Cf. Pasco v.*
> *Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 839 (6th Cir. 2005) ("[T]he
> Government notes that the 1995 and 1996 exams by [the treating
> physician] took place well before [the claimant's] alleged onset date of
> November 1999 . . . . However, the ALJ considered evidence from . . .
> exams that took place prior to 1999, so it does not appear that the ALJ
> necessarily found the earlier exam irrelevant."). Once again, the date of
> Dr. Murray's questionnaire may have been an acceptable reason for the
> ALJ to reject her opinions. The ALJ was procedurally required to articulate
> such reasoning, and failed to do so.

Case no. 2:09-cv-00283, doc. 41 at PageID 166.

Following remand, the administrative law judge held a second hearing on

September 13, 2011. On September 20, 2011, the administrative law judge issued a

decision finding that plaintiff was not disabled prior to March 8, 2008. Plaintiff commenced this action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge erred in rejecting the opinions of plaintiff's treating physicians, Drs. Murray and Franklin; and,

- The administrative law judge erred in rejecting the opinions of plaintiff's examining physicians, Drs. Hoy, Frank, Brinker and Gilliam.

**Procedural History.**  Plaintiff  filed his application for disability insurance benefits on November 22, 2004, alleging that he became disabled on January 1, 1994, at age 40, by lupus, arthritis, and a heart condition.  (R. 65, 77.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On December 4, 2007, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  (R. 370.)  A vocational expert also testified.  On March 28, 2008, the administrative law judge issued a decision finding that Judd was disabled within the meaning of the Act beginning March 8, 2008.  (R. 33.)  On February 9, 2009, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 6-9.)

Following remand, a second hearing before the administrative law judge was held September 13, 2011. (R. 619.) On September 20, 2011, the administrative law judge

3

issued a decision finding that Judd was disabled within the meaning of the Act

beginning March 8, 2008. (R. 421.)

**Age, Education, and Work Experience.** David Judd was born March 10, 1953

(R. 65.) He completed the 11th grade. (R. 82.) He has worked as a gas station attendant,

night shift foreman, and a welder. He last worked September 1, 1987. (R. 78.)

**Plaintiff's Testimony.** The administrative law judge fairly summarized Judd's

testimony in his March 28, 2008 decision as follows:

> The claimant testified that he became unable to work due to lupus in the
> late 1980's. The lupus has gotten worse over the years. He suffers pain in
> his lower back and his legs. The Achilles tendon in his left leg was
> "shrunk" by the lupus; after reparative surgery, the tendon did not heal
> correctly since he was taking so many steroids. The toes on his left foot are
> all curled up; he has no muscle tone at all in his left leg; and his heel was
> "pounded off" of his foot. It is for this reason that he was given an AFO
> brace. The claimant has used a cane all the time for six or seven years. He
> occasionally uses a walker if he is going to be on his feet for any length of
> time.

> In addition to pain in his back and legs, the claimant also suffers pain in
> his knees, elbows and occasionally his jaw, which he attributed to the
> lupus. He rated the intensity of his back and left leg pain as "way over 10"
> on a "0 to 10" pain scale. In addition to medications, the claimant has had
> steroid injections, although he said that they are not of much help. He has
> gone to the emergency room a lot of times because the pain is so severe.

> The claimant has been treated two times for blood clots in his right leg. He
> takes Coumadin, a blood thinner, and he will have to continue to do so for
> the rest of his life. He has not had any blood clot problems since he was
> hospitalized for deep vein thrombosis.

> The claimant said that he is short of breath most all the time, but he did
> not know why. He does use inhalers. He was hospitalized a few months
> prior to the hearing, when he got pneumonia, and his right lung collapsed.
> He used a breathing machine only when he was in the hospital.

4

The claimant testified that he has had heart trouble in the past, for which he had two catheterizations, as well as stent placement. Although that did not resolve his problem, he experiences no chest pain or other symptoms.

The claimant has lost vision in his left eye. This has been occurring gradually; he has seen nothing but a blur for six to eight months. His doctor is going to send him to an eye specialist.

Mentally, the claimant testified that he does not want to be around anyone, and he stays home all the time. He takes an antidepressant, prescribed by his family doctor, which he said does not help. He has had no counseling.

The claimant takes a large number (about 20) of medications, but he denied any side effects. He has not been hospitalized since July 2007.

The claimant has trouble sleeping at night, despite taking Trazodone and Klonopin, depending on how bad the pain is. There are some nights, maybe seven or eight per month, when he does not sleep at all.

The claimant has not had a driver's license for six or seven years, having lost it when he was caught driving after it had been suspended. His niece brought him to the hearing. Despite the pain in his joints, the claimant can use his hands, for example, to button and zip. He testified that he can walk a distance of half a block, stand for 10 minutes, and sit for no more than 30 minutes. He can lift maybe 10 pounds. He cannot climb steps at all.

At the time of the hearing, the claimant was living in a mobile home with his 19-year old son. As to daily activities, the claimant does no household chores or anything else around the house. His son does these things, because he "can't hardly stand up." He does go out and walk around in the yard every once in a while after which he goes back in and lies down. Friends and relatives come to visit him. The claimant's only other daily activity is watching TV. His appetite is good, and he can feed, dress and groom himself. Asked about trips, he said that they went to Indiana July 4th, adding that they had to stop every 40 to 50 miles so he could get out and stretch his legs.

(R. 22-23.) The administrative law judge summarized plaintiff's testimony at the

September 13, 2011 as follows:

> At the September 2011 hearing, the claimant again complained of lupus, joint pain and swelling, shortness of breath, and depression during the relevant time period. He said that he used a cane "all the time" and that he used inhalers for emphysema but did not use a breathing machine. As for depression, he said he took antidepressant medications, which were prescribed by his family physician, but did not attend counseling or see a psychiatrist. He complained of no adverse side effects from his medication and said that his pain medications helped somewhat. He estimated that, prior to March 2008, he could walk no more than 50 to 60 feet before needing to rest, stand for an hour at a time, sit no more than 10 minutes at a time, and lift no more than 10 pounds at a time. Regarding activities of daily living, the claimant testified that he sometimes did not get out of bed for 2 to 3 days at a time. He stated that he sometimes prepared meals and that his son did the household chores, although he "probably could have" done these chores on his own. According to the claimant, he was able to feed, dress, and groom himself, and he walked around his yard for exercise.

(R. 416.)

**Medical Evidence of Record.** The administrative law judge's decision fairly sets

out the relevant medical evidence of record. This Report and Recommendation will

only briefly summarize that evidence from Drs. Murray, Franklin, Hoy, Frank, Brinker

and Gilliam.

Laura Murray, M.D. Dr. Murray, a doctor with Mad River Internal Medicine,

began treating plaintiff on February 12, 1998. (R. 267.) Dr. Murray noted that plaintiff

had been diagnosed with lupus in 1988. Following a left Achilles tendon repair, plaintiff

had atrophy of the left calf muscles. He also was diagnosed with deep vein thrombosis.

Plaintiff reported discomfort in his right lower extremity, particularly in the foot and

6

ankle. His right calf was noticeably more swollen than the left. Dr. Murray diagnosed chronic pain disorder. Based on his deep vein thrombosis, plaintiff required Coumadin therapy for the rest of his life. (R. 267.)

On March 3, 1998, Dr. Murray noted symptoms of fibromyalgia. Plaintiff reported bilateral hand stiffness and occasional pain, bilateral low back pain, and difficulty walking due to pain in the right anterior thigh and posterior calf. (R. 266.) On June 30, 1998, Dr. Murray noted that plaintiff had pain in the bilateral shoulders.(R. 264.) On September 15, 1998, plaintiff noted that his chronic pain had been particularly bad. (R. 263.) On October 13, 1998, plaintiff reported falling recently due to his left hip giving out. Strength was acceptable proximally and distally in both lower extremities. He was able to stand on his heels bilaterally and on his right toes. He had deformity in his left toes because of the Achilles tendon rupture on the left. He had creaking in his knees. (R. 262.)

On January 25, 1999, Dr. Murray wondering if plaintiff had a low grade depression. (R. 260.) On April 5, 1999, plaintiff reported knee instability resulting in falls. He had ongoing bilateral shoulder pain. (R. 259.) On July 19, 1999, Dr. Murray noted that plaintiff's lupus symptoms were fairly stable. He reported increased low back pain. He reported tingling and soreness in his feet. (R. 256-57.)

On November 11, 1999, plaintiff reported stiffness, swollen glands, and not feeling well. He had been experiencing occipital headaches for the last 5-6 weeks. (R. 255-54.) On January 2000, plaintiff reported persistent headaches. (R. 253.) On March 9,

2000, Dr. Murray reported that plaintiff's pain symptoms were reasonably controlled. (R. 253.) On June 12, 2000, plaintiff reported that he was not sleeping well. (R. 252.)

On August 16, 2000, plaintiff reported falling three times in the past 24 hours because his leg gave out on him. (R. 250.)  On April 19, 2001, Dr. Murray noted that plaintiff was toward the end of a wave of severe pain in his legs. He also reported pain in the left hip joint, which was swollen and stiff. (R. 240.) On July 18, 2001, plaintiff reported that pain in his low back and legs was resulting in more periods of total disability. He had some cog-wheeling type rigidity on passive range of motion of both elbows. (R. 239.) On November 5, 2001, plaintiff reported pain in his low back and legs. His sister reported that plaintiff was in so much pain that he could not raise himself up from the couch except for the first date that a new Duragesic patch was applied. He was unable to work. Dr. Murray noted that plaintiff had chronic obstructive pulmonary disease. (R. 237.)

On September 21, 2000, Dr. Murray completed an assessment at the request of Bureau of Disability Determination. (R. 981-89.) Dr. Murray noted that plaintiff has reported symptoms for the past 7-8 years affecting his distal legs, hips, knees, low, back, shoulders, elbows, and jaw requiring opiate pain medication. His symptoms frequently prevented him from completing basic grooming and household tasks. His reported symptoms were evidenced by his clinical appearance in the office. He fell frequently. He also had significant sleep impairment with daytime hypersomnolence. He had frequent and severe headaches, which aggravated his condition. (R. 981.) Dr. Murray

noted that plaintiff was primarily limited by pain with the exception of his left leg due to a chronically unstable knee and an Achilles tendon rupture with left calf atrophy. Plaintiff was also limited by stiffness in his muscles and joints. With respect to sensory changes, he had paresthesias, particularly in his feet. He had reflex abnormalities in his left patella tendon and with left ankle jerk. His sensation to light touch appeared to be intact. He was unable to walk on his left toes due to pain, injury to his left Achilles tendon, and left muscle atrophy. (R. 982.). An August 1999 MRI of the left knee showed small effusion, degenerative changes in the posterior medial and lateral menisci, osteophyte and femeral condylysyis and tibial plateau. X-rays of the left hip, right should, and spine were normal. X-rays of the left knee showed no bony abnormality. X-rays of the left shoulder showed a possible AC joint separation. (R. 985.)  Since 1999, he required the use of a cane for any ambulation. (R. 983.) His ability to perform self-care and activities of daily living were restricted by pain. (R. 985 and 987-88.) Dr. Murray diagnosed lupus, chronic fatigue, fibromyalgia, depression, restless leg syndrome and deep vein thrombosis. Dr. Murray opined that plaintiff was not capable of maintaining employment.  (R. 981-89.)

On February 11, 2002, Dr. Murray noted that plaintiff had an abnormal stress test after a report of chest discomfort. He under went a repeat cardiac catheterization with partly successful angioplasty and stenting of a diagonal branch in the anterior circulation with unsuccessful recanalization of the LAD. (R. 236.) On April 11, 2002, plaintiff reported chest discomfort following an unusual level of exertion for him. (R.

235.) On May 13, 2002, plaintiff reported periodic moments of angina during the night which are brief and relieved with nitroglycerin. (R. 234.)

On January 23, 2003, plaintiff reported that he felt chronically ill.(R. 226.) On April 23, 2004, Angela Rutan, a certified nurse practitioner, noted that plaintiff's B12 deficiency, peripheral neuropathy, angina, and deep vein thrombosis were all stable. Plaintiff reported worsening pain. (R. 218.)

Thomas C. Franklin, M.D. On August 24, 1999, Dr. Franklin, an orthopedist, began treating plaintiff following a referral from Dr. Murray. Results of a physical examination were consistent with a longstanding ACL instability in the knee with a posterior anterior drawer and a positive Lachman's. Some of plaintiff's symptoms appeared more meniscal than ligamentous. He referred plaintiff for an MRI scan. (R. 991.)

An August 27, 1999 MRI revealed small joint effusion; linear signal within the posterior horns of the medial and lateral meniscus, which were likely degenerative in nature; and small osteophytes were seen from the femoral condyles and the tibial plateau. (R. 992.)

In a September 8, 1999 letter, Dr. Franklin indicated that plaintiff had an underlying connective tissue disorder making him prone to joint problems. He opined that plaintiff would be unable to work for the next three months pending the need for surgical treatment. (R. 995.) On November 3, 1999, Dr. Franklin opined that the longer plaintiff went without the surgery the better. (R. 997.) Dr. Franklin noted that plaintiff's

knee had improved with the use of a cane and that he had experienced few episodes of buckling or giving way. He had a very laxed knee. Dr. Franklin believed that ACL reconstruction for plaintiff would be "fraught with peril." (R. 998.) On March 7, 2000, Dr. Franklin opined that plaintiff was permanently disabled from work due to his significant orthopedic problems in his lower extremities and history of collagen vascular disease, which impacted his entire system. (R. 999.)

Debra L. Brinker, M.D. Dr. Brinker completed a Basic Medical Form based on her July 26, 1999 examination. Dr. Brinker noted that plaintiff had a history of lupus, blood clots in his right leg, left Achilles tendon rupture, renal failure, fibromyalgia, chronic bilateral shoulder pain, and low back pain. On physical examination, he exhibited left leg atrophy, diminished reflexes, and decreased bilateral shoulder abduction. His abilities to sit, stand, and walk were limited. He could sit for one hour in an eight hour day. He could lift and/or carry up to five pounds. He had moderate limitations in his abilities to push, pull, and reach. He was extremely limited in his ability to perform repetitive foot movements. Plaintiff walked with a limp and was unable to flex or extend his left ankle. He could not sit for extended periods of time because of his history of blood clots. He could not perform a job that required walking, and he was unable to reach or lift due to his lupus. She opined that plaintiff would be unemployable for more 12 months or longer. (R. 935-36.)

Dr. Mujeeb A. Ranginwala. In April 2000, Dr. Ranginwala examined Judd at the request of Dr. Murray. He indicated that a physical examination and laboratory tests

11

demonstrated that plaintiff's lupus was "under good control," but that he had "myofascial pain syndrome which may be causing generalized fatigue and myalgias." (R. 252 and 427.)

Peter Hoy, D.O. Dr. Hoy completed a Basic Medical Form based on his August 11, 2000 examination. He noted that plaintiff's lupus had been symptomatic since 1985 and that plaintiff was diagnosed in 1987. Plaintiff had chronic pain and fibromyalgia. Plaintiff limped when he walked and required the use of a four-prong cane. He was prescribed Coumadin for blood clots. Plaintiff's abilities to stand, sit, lift and carry were affected. He could frequently carry up to five pounds. Plaintiff was moderately limited in his abilities to push, pull and handle. He was extremely limited in his abilities to perform repetitive foot movements. Because of his history of recurrent blood clots, he was unable to sit or stand for extended periods. (R. 1003-04.)

Robert E. Frank, Jr., M.D. On October 2, 2000, Dr. Frank, a disability specialist, performed a consultative examination of Judd at the request Bureau of Disability Determination. Plaintiff complained of intermittent joint pain. He had migratory arthralgias, but no true effusions. He had joint pain in all his joints, particularly in left hip, knee, and foot. He had an episode of renal failure secondary to lupus, although his renal function was presently normal. He had a history of deep vein thrombosis. He used a left AFO because of problems with his Achilles tendon. He also used a quad cane. He had limited movement of his left ankle and pain with weight bearing. He also complained of left hip and knee pain with weight bearing of more than 30 minutes.

12

Dr. Frank noted that Judd lived with his 12 year old son. Plaintiff cooked and cleaned. On physical examination, plaintiff had full range of motion in his knees without pain with bilateral crepitation. There was no instability. He had decreased range of motion in his left hip because of subjective discomfort. He could only squat halfway down due to left ankle and hip pain. He was unable to stand on his toes or his heel with his left ankle. He had very limited range of motion in his left ankle and mild weakness of his foot muscles on the left. Walking without his cane caused him to limp significantly, favoring the left leg.

Dr. Frank noted degenerative arthritis in both knees and in his left hip. There was no evidence of residual effects of his deep vein thrombosis. (R. 1005-07.)

Dorsey L. Gilliam, M.D. On January 9, 2002, Dr. Gilliam examined plaintiff at the request of the Bureau of Disability Determination. On physical examination, plaintiff's gait was described as "okay"' he walked with a four-prong cane. Plaintiff had decreased breath sounds and prolonged expiration. Range of motion was decreased in his left ankle. There was atrophy of the left calf. Both knees exhibited 1+ crepitus. He had 2+ pulses in the lower extremity arteries. Straight leg raising was negative. Lumbar flexion was 45 degrees, and extension was 5 degrees. Lateral flexion to the right was 15 degrees, and lateral flexion to the left was 15 degrees. There was no evidence of joint abnormalities. Muscle weakness was 4/5. He had a weak grasp of his right hand, which was his dominant hand. Dr. Gilliam opined that plaintiff could sit and stand at will.

13

Plaintiff could walk a little. Plaintiff could lift and carry 3 to 8 pounds occasionally. He

could handle objects easily. (R. 1021-23.)

In December 2004, Dr. Augusto Pangalangan reviewed the medical evidence for

the Bureau of Disability Determination (R. 269-76) and concluded that Judd retained the

ability to perform work having light exertional demands. (R. 270.) In May 2005, Dr.

Walter Holbrook reviewed the medical record and agreed with Dr. Pangalangan's

residual functional capacity assessment. (R. 276.)

### Administrative Law Judge's Findings.

1. The claimant has not engaged in substantial gainful activity between November 22, 2004, and March 8, 2004 (20 CFR 416.971 *et seq.*).

2. Between November 22, 2004, and March 8, 2008, the claimant had the following severe impairments: systemic lupus erythematosus, chronic left leg pain with history of Achilles tendon repair and deep vein thrombosis, emphysema, history of peripheral neuropathy, and depression (20 CFR 416.920(c)).

3. Between November 22, 2004, and March 8, 2008, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that, between November 22, 2004, and March 8, 2008, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), subject to the following limitations: standing and/or walking no more than 4 hours in an 8-hour workday; no repetitive use of foot controls or climbing of ladders, ropes, or scaffolds; only occasional climbing of stairs, stooping, crouching, or crawling; no exposure to hazards (such as dangerous machinery, unprotected heights, etc); no exposure to concentrated

amounts of irritants; no work on uneven surfaces; no direct dealing with the general public; and no requirement to maintain concentration on a single task for longer than 15 minutes at a time.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on March 10, 1953, and was 51 years old, which is defined as an "individual closely approaching advanced age," on the alleged disability onset date. He remained an "individual closely approaching advanced age" through the relevant time period (20 CFR 416.963).

7.      The claimant has a "limited" education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of jobs skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering his age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant could have performed between November 22, 2004, and March 8, 2008 (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, between November 8, 2004, and March 8, 2008 (20 CFR 416.920(g)).

(R. 415-21.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id*.  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir.

1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**   Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- <u>The administrative law judge erred in rejecting the opinions of plaintiff's treating physicians, Drs. Murray and Franklin</u>. Plaintiff argues that the administrative law judge erroneously found that the opinion of Dr. Murray was outdated and not relevant to plaintiff's condition three to seven years later. Plaintiff maintains that Dr. Murray's opinion is entitled to controlling weight, and the administrative law judge erred when he gave deference to the opinions Drs. Pangalangan and Holbrook, who simply reviewed the record and did not examine or observe plaintiff. Plaintiff argues that Dr. Murray's opinions were supported by her clinical findings. Dr. Murray is not the only treating physician to find that plaintiff was disabled. Dr. Franklin, plaintiff's treating orthopedist, stated that plaintiff had a severe ligamentous injury to his

16

knee, problems with his feet and ankles, and a history of collage vascular disease. According to Dr. Franklin, his combination of impairments resulted in plaintiff being permanently disabled.

- The administrative law judge erred in rejecting the opinions of plaintiff's examining physicians, Drs. Hoy, Frank, Brinker and Gilliam. Plaintiff argues that the opinions of Drs. Murray and Franklin are supported by the examining physicians, Drs. Hoy, Frank, Brinker and Gilliam. Plaintiff maintains that their opinions were supported by clinical findings based on their physical examination of plaintiff. The administrative law judge improperly rejected their opinions on the basis that they were not treating physicians and that he could not assume that plaintiff's condition had not improved in the interim. Plaintiff argues that it is mere speculation on the part of the administrative law judge that plaintiff may have improved. Rather, the evidence demonstrates that plaintiff's condition continued to deteriorate.

**Analysis.** Plaintiff argues that the administrative law judge erred in rejecting the opinions of plaintiff's treating physicians, Drs. Murray and Franklin and the opinions of plaintiff's examining physicians, Drs. Hoy, Frank, Brinker and Gilliam.

Treating Doctor: Legal Standard.  A treating doctor's opinion[1] on the issue of disability is entitled to greater weight than that of a physician who has examined plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record.  20 C.F.R. § 404.1527(d)(1).  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The Commissioner's regulations explain that Social Security generally gives more weight to a treating doctors' opinions because treators are usually "most able to provide a detailed, longitudinal picture" of the claimant's medical impairments. 20 C.F.R. § 404.1527(d)(2).  When the treating doctor's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the Commissioner "will give it controlling weight. " *Id.*

---

[1]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2). Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2. When an administrative law judge fails to give a good reason for rejecting a treator's medical opinion, remand is required unless the failure does not ultimately affect the decision, *i.e.*, the error is *de minimis*. *Wilson*, 378 F.3d at 547. So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 1527(d)(2) but does not technically meet all its requirements. *Id.*

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable."  42 U.S.C. §423(d)(1)(A).  Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence.   *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975).  20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527(a)(1)[2].

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."  20 C.F.R. § 404.1527(d)(1).  When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case

---

[2]Section 404.157(a)(1) provides:
You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See §404.1505. Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. See §404.1508.

record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).  In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision.  *Id.*  Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled.  20 C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."  Consequently, the decision-maker must have "an understanding of the clinical signs and laboratory findings and what they signify."  *Id.*  When the treating source's opinion "is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight . . . ."  The Commissioner's regulations further provide that the longer a doctor has treated the claimant, the greater weight the Commissioner will give his or her medical opinion.  When the doctor has treated the claimant long enough "to have obtained a longitudinal picture of your impairment, we will give the source's

20

[opinion] more weight than we would give it if it were from a non-treating source." 20 C.F.R. §404.1527(d)(2)(I).

The Commissioner has issued a policy statement about how to assess treating sources' medical opinions.  Social Security Ruling 96-2p.  It emphasizes:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator.

Even when the treating source's opinion is not controlling, it may carry sufficient weight to be adopted by the Commissioner:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p.

The case law is consistent with the principals set out in Social Security Ruling 96-2p. A broad conclusory statement of a treating physician that his patient is disabled is not controlling. *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). Even when the Commissioner determines not to give a treator's opinion controlling weight, the decision-maker must evaluate the treator's opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2). *Wilson,* 378 F.3d at 544; *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable

presumption that the treating physician's opinion "is entitled to great deference." *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007); *Hensley,* above. The Commissioner makes the final decision on the ultimate issue of disability. *Warner v. Commissioner of Social Security,* 375 F.3d at 390; *Walker v. Secretary of Health & Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

<u>Treating Doctor: Discussion</u>.  With respect to the opinion evidence, the administrative law judge stated:

> Treating physician Dr. Murray completed a physical capacities assessment on September 21, 2000. Dr. Murray did not provide any specific functional limitations, but she opined that the claimant was not "capable of maintaining employment" due to his physical condition (Prior Application file, pages 730-738). Dr. Hoy examined the claimant and completed a Basic Medical Form for ODJFS on August 11, 2000, and he offered his opinion that the claimant was limited to a reduced range of work and was "unemployable" (Prior Application File, pages 752-53). Consultative physician Dr. Frank examined the claimant on October 2, 2000, and he offered his opinion that the claimant could not walk without the use of a quad cane (Prior application file, pages 754-764). Finally consultative physician Dr. Gilliam examined the claimant on January 15, 2002, and he offered his opinion that the claimant could sit and stand "at will," walk "a little," and lift and carry 3 to 8 pounds occasionally. Dr. Gilliam opined that the claimant could handle objects easily, that his speaking and hearing skills were good, and that traveling was permitted (Prior Application File, pages 770-781).
>
> The undersigned gives little weight to Dr. Murray when applying the criteria set forth for the evaluation of treating source opinions in 20 CFR 416.927 and SSR 96-2p. Drs. Hoy, Frank, and Gilliam examined the plaintiff on only one occasion and therefore are not "treating" sources pursuant to 20 CFR 416.927(d). As for Dr. Murray's opinion, her responses

on the assessment form failed to address many of the objective criteria related to the claimant's condition that the August 2000 questionnaire required. She also failed to outline specific restrictions regarding the claimant's functional work abilities. Moreover, all of the physicians' opinions described above are outdated and not connected to the relevant time period. Even if these physicians' opinions were supported and well-founded in objective evidence–which they are not–it cannot be automatically be assumed that the claimant continued to be disabled from November 2004 to decision, the objective evidence relating to the relevant time period supports a conclusion that the claimant is limited to a reduced range of light exertion. For example, several of these physicians stated that the claimant required the use of a cane for ambulation, but progress notes from Ms. Rutan at Mad River Internal Medicine consistently document a relatively normal gait and no use of a cane between April 2006 and January 2008 (Exhibits B38F and 42F). Moreover the determination of disability is a question reserved to the Commissioner, and there is no indication that nay of these physicians are qualified to offer an opinion on the claimant's employability.

(R. 417-18.) With respect to Dr. Brinker, the administrative law judge stated:

Debra Brinker, M.D. examined the claimant and completed a Basic Medical Form on July 26, 1999, and she offered her opinion that the claimant was limited to a reduced range of sedentary work and was "unemployable" (Prior Application file, pages 684-685). The undersigned gives little weight to this opinion as the ultimate conclusion of disability is an issue reserved for the Commissioner of Social Security. Moreover, her opinion is outdated, and object findings during the relevant time period support the conclusion above that the claimant is capable of performing a reduced range of light work.

(R. 418.)

Here, the administrative law judge provided sufficient rationale for his decision to reject the opinions of Dr. Murray. As plaintiff acknowledged, examining physicians such as Drs. Hoy, Frank, Gilliam, and Brinker are not entitled to deference afforded treating physicians. He concluded that Dr. Murray's opinion was not relevant because it

was not based on the relevant time period. The administrative law judge noted other clinical findings made during the relevant time period demonstrating that plaintiff remained capable of performing a reduced range of light work until March 9, 2008. The administrative law judge also rejected Dr. Murray's opinion because it failed to identify the objective criteria and specific restrictions with respect to plaintiff's functional work abilities.  The administrative law judge's decision relied on substantial evidence during the relevant time period to support his finding that plaintiff could perform a reduced range of light work between November 22, 2004 and March 8, 2008.

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.  **It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District

Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).


   s/Mark R.  Abel
United States Magistrate Judge